UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALTER MICHAEL HOUSTON,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Case No. 17-cv-04816-KAW<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 14, 16 |

Plaintiff Walter Michael Houston seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision, and the remand of this case for payment of benefits, or, in the alternative, for further proceedings. Pending before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. Having considered the papers filed by the parties, and for the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment, and GRANTS Defendant's cross-motion for summary judgment.

### I. BACKGROUND

On January 8, 2014, Plaintiff applied for Title II benefits, alleging a disability that began on October 13, 2013. (Administrative Record ("AR") 81.) The Social Security Administration ("SSA") denied Plaintiff's application initially and on reconsideration. (AR 94, 110.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 126.)

The ALJ considered a number of opinions in rendering a decision. On March 11, 2014, Plaintiff was examined by Amy T. Watt, Ph.D. (AR 395.) Plaintiff arrived on-time and filled out the information form without difficulty, and his hygiene and grooming were adequate. Plaintiff reported having developed anxiety following a car crash in 2013. Plaintiff reported no history of emotional issues prior to the 2013 car accident, but that after the accident, Plaintiff started

experiencing anxiety, panic attacks, nightmares, sleep disturbance, flashbacks, and fear reactions around cars. Plaintiff also reported seeing a therapist since late 2013, but that he did not take any psychotropic medication. In terms of social functioning, Plaintiff stated that he mostly stayed at home to avoid different sounds and cars, and that he had few friends that he did not socialize with outside of home. With respect to activities of daily living, Plaintiff asserted that he could mostly take care of his personal hygiene, but that he needed help with household chores due to the weakness of his right arm and back spasms. (AR 396.) Plaintiff also stated that he did not usually go out or socialize. Dr. Watt observed that Plaintiff was mostly depressed and anxious throughout the interview, expressing serious distress over his high level of anxiety. Plaintiff's speech was within normal limits, but his thinking process was somewhat scattered, such that he had problems reporting time, dates, and sequence of events. There was, however, no evidence of serious psychotic symptoms such as delusions or paranoia. Plaintiff was oriented to time, place, and person, and was able to identify the United States president and California governor. Plaintiff was not able to repeat number digits forward and backwards, and had some difficulty stating how two words were similar.

Based on the mental status evaluation, Dr. Watt opined that Plaintiff had posttraumatic stress disorder ("PTSD"). (AR 396.) Dr. Watt found that Plaintiff presented many symptoms related to PTSD, including depression, high anxiety, irritability, mood swings, problems sleeping, nightmares, hypervigilance, flashbacks, and recurrent thoughts about trauma. Dr. Watt concluded that the symptoms were serious enough to cause significant impairment in Plaintiff's overall function. Dr. Watt assigned a GAF score of 50. Dr. Watt assessed marked impairments in Plaintiff's ability to perform one- or two- step job instructions, follow detailed and complex instructions, relate and interact with coworkers and the general public, maintain persistence and pace, associate with day to day work activities, accept simple instructions from supervisors, perform work activities on a consistent basis, and perform work activities without special or additional supervision. (AR 397.) Dr. Watt also opined that given Plaintiff's high level of anxiety and scattered thinking process, Plaintiff would need help managing his money.

Following a hearing, the ALJ rejected Plaintiff's application on March 22, 2016. (AR 16-

2

27.) A request for review of the ALJ's decision was filed with the Appeals Council on March 22, 2016. (AR 193.) The Appeals Council denied Plaintiff's request for review on June 23, 2017. (AR 1.) On August 18, 2017, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). (Compl., Dkt. No. 1.)

On January 16, 2018, Plaintiff filed his motion for summary judgment. (Plf.'s Mot., Dkt. No. 14.) On February 12, 2018, Defendant filed an opposition and cross-motion for summary judgment. (Def.'s Opp'n, Dkt. No. 16.) On February 23, 2018, Plaintiff filed a reply. (Plf.'s Reply, Dkt. No. 16.)

## II. LEGAL STANDARD

A court may reverse the Commissioner's denial of disability benefits only when the Commissioner's findings are 1) based on legal error or 2) are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is "more than a mere scintilla but less than a preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098; *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Id.* "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Under SSA regulations, disability claims are evaluated according to a five-step sequential evaluation. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). At step one, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. *Id.* If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments," as defined in 20 C.F.R. § 404.1520(c). *Reddick*, 157 F.3d 715 at 721. If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commissioner proceeds to step three, and determines whether the impairment meets or equals a listed impairment under 20 C.F.R. § 404,

Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If this requirement is met, the claimant is disabled. *Reddick*, 157 F.3d 715 at 721.

If a claimant does not have a condition which meets or equals a listed impairment, the fourth step in the sequential evaluation process is to determine the claimant's residual functional capacity ("RFC") or what work, if any, the claimant is capable of performing on a sustained basis, despite the claimant's impairment or impairments. 20 C.F.R. § 404.1520(e). If the claimant can perform such work, he is not disabled. 20 C.F.R. § 404.1520(f). RFC is the application of a legal standard to the medical facts concerning the claimant's physical capacity. 20 C.F.R. § 404.1545(a). If the claimant meets the burden of establishing an inability to perform prior work, the Commissioner must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick*, 157 F.3d 715 at 721. The claimant bears the burden of proof in steps one through four. *Bustamante v. Massanari*, 262 F.3d 949, 953-954 (9th Cir. 2001). The burden shifts to the Commissioner in step five. *Id.* at 954.

### III. THE ALJ'S DECISION

On March 22, 2016, the ALJ issued an unfavorable decision. (AR 16-27.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 13, 2013, the alleged onset date. (AR 18.)

At step two, the ALJ identified the following severe impairments: obesity, anxiety disorders, and essential hypertension. (AR 18.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (AR 19.) With respect to Plaintiff's mental impairments, the ALJ found that they did not meet or medically equal the criteria of listing 12.06. The ALJ considered the "paragraph B" criteria, namely whether the mental impairments resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated, extended episodes of decompensation.

The ALJ found mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (AR 19.)

4

In so concluding, the ALJ noted that Plaintiff had a good relationship with members of his family, and helped his sons get ready for school, helped with house duties, picked up his sons and tried to help them, put his boys to bed and tried to exercise, and helped take care of his sons and help them with their daily needs. Plaintiff also took care of pets, including feeding, watering, and changing the litter box. (AR 19-20.) Plaintiff had no problems with personal care, and prepared simple meals daily. (AR 20.) Plaintiff cleaned and did laundry and light housework. Plaintiff also went outside daily, and could drive and go out alone. Plaintiff went shopping in public stores for a few hours approximately twice a week, could pay bills and count change, and watched television and spent time with others. Plaintiff was active on social media, and would go to church and doctor appointments on a regular basis, without needing to be accompanied. Plaintiff also experienced no episodes of decompensation of an extended duration.

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a range of light work. (AR 20.) Specifically, Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, could stand and/or walk for six hours out of an eight-hour workday with normal breaks, could sit for six hours out of an eight-hour workday with normal breaks, could have occasional face-to-face public contact, had no limitations on telephone public contact, could never climb ladders or ropes or scaffolds, could never walk around concentrated exposure to excessive cold or heat, and could not work around hazards.

The ALJ found that Plaintiff's impairments could reasonably be expected to produce the asserted pain or other symptoms, but that Plaintiff's credibility was reduced by several factors. (AR 21.) First, the ALJ concluded that Plaintiff's credibility was "reduced by the fact that despite impairment, the claimant has engaged in a somewhat normal level of daily activity and interaction." (*Id.*) The ALJ again reiterated the daily activities performed by Plaintiff, and noted that while these activities "were somewhat limited, some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating condition." (*Id.*) Thus, Plaintiff's "ability to participate in such activities undermined the credibility of [Plaintiff's] allegations of disabling functional limitations." (*Id.*)

5

The ALJ further observed that even if the daily activities were as limited as alleged, it was "difficult to attribute that degree of limitation to [Plaintiff's] medical conditions, as opposed to other reasons, in view of the relatively benign medical evidence and other factors discussed in this decision." (*Id.*)

The ALJ also found that Plaintiff's credibility regarding the severity of symptoms and limitations was diminished because Plaintiff received routine conservative treatment. (AR 21.) Further, the ALJ concluded that the objective clinical and diagnostic findings did not support more restrictive functional limitations than those assessed, and that there was no medical source statement from a treating physician that endorsed the extent of Plaintiff's alleged functional limitations.

The ALJ then reviewed the medical evidence. With respect to Plaintiff's mental health, the ALJ reviewed Dr. Watt's consultative exam. (AR 22.) The ALJ noted that Dr. Watt assigned a GAF score of 50, which was "very close to a finding of moderate symptoms or moderate difficulty functioning which would not be inconsistent with the findings herein." (AR 23.) The ALJ ultimately gave Dr. Watt's opinion of marked impairments in all work-related mental abilities little weight "because it appears to have been based on the claimant's subjective statements rather than any objective evidence." (*Id.*) The ALJ also found that Dr. Watt's opinion was not consistent with Plaintiff's conservative treatment or his activities of daily living. Finally, the ALJ gave greater weight to the opinions of other reviewing medical experts whose opinions were more consistent with the medical record.

The ALJ also gave little weight to a May 2014 medical source statement completed by Darrell Cacciaroni, explaining that Mr. Cacciaroni was not an acceptable medical source. (AR 24.) The ALJ further found that the opinion provided little analysis or explanation and appeared to be based on Plaintiff's subjective complaints rather than objective treatment records, as well as being inconsistent with Plaintiff's conservative treatment and activities of daily living.

Next, the ALJ gave little weight to the functional capacity questionnaire completed by Dr. Kenneth Katzman. (AR 24.) As with Mr. Cacciaroni's opinion, the ALJ found that Dr. Katzman's opinion provided little analysis or explanation, appeared to be based on Plaintiff's subjective

complaints rather than objective treatment records, and was inconsistent with Plaintiff's conservative treatment record and activities of daily living.

At step five, the ALJ found that Plaintiff was capable of performing past relevant work as a courier. (AR 25.) The ALJ also found that Plaintiff could work as a telephone solicitor, assembler of small products, marker, and laboratory sample carrier. (AR 26.) Based on the number of jobs available, the ALJ concluded that Plaintiff was not disabled. (AR 27.)

## IV. DISCUSSION

Plaintiff challenges the ALJ's decision solely on the basis of whether the ALJ properly considered Dr. Watt's opinion. (*See* Plf.'s Reply at 3.) Plaintiff raises four arguments.

First, Plaintiff argues that the ALJ observed that Dr. Watt's assigned GAF score of 50 was one point below 51, which would have been a different category of assessment. (Plf.'s Mot. at 9.) Plaintiff contends this observation, while true, violates agency policy because it ignores that Dr. Watt did in fact assign a GAF score of 50. (*Id.*) Plaintiff does not, however, explain why this is relevant, as the ALJ did not rely on this one point differential in explaining why little weight was given to Dr. Watt's opinion. Further, as Plaintiff points out, the SSA has generally considered GAF scores to "not have a direct correlation to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,765 (Aug. 21, 2000) (to be codified at 20 C.F.R. pts. 404 & 416). Thus, it is not clear how the ALJ's observation was prejudicial. *See Doney v. Astrue*, 485 Fed. Appx. 163, 165 (9th Cir. 2012) (finding no error where the ALJ disregarded a GAF score because "[t]his court, however, has recognized that the Commissioner has determined the GAF scale does not have a direct correlation to the severity requirements in the [SSA]'s mental disorders listings") (internal quotation omitted); *Meritt v. Colvin*, 572 Fed. Appx. 468, 469-70 (9th Cir. 2014) (agreeing that any error in failing to discuss the GAF scores "was harmless because the mere fact that low GAF scores may have been assessed by [the plaintiff's] mental health treatment providers is not in itself sufficient to require the adoption of functional limitations stemming therefrom") (internal quotation omitted).

Second, Plaintiff argues that the ALJ erred in rejecting Dr. Watt's opinion as being based

7

solely on subjective statements rather than objective evidence, as Dr. Watt also observed Plaintiff's mood, affect, speech, thought process, orientation, memory/concentration, and information. (Plf.'s Mot. at 10.) Defendant responds that Plaintiff could have feigned his responses to Dr. Watt's testing on his ability to repeat certain digits forward and backward. (Def.'s Opp'n at 5.)

The Court agrees with Plaintiff that this was not a proper reason for rejecting Dr. Watt's opinion. In *Hayden v. Colvin*, the psychologist performed a consultative psychological examination that included a clinical interview, records review, and mental status exam. No. 3:13-cv-5790-KLS, 2014 WL 3362470, at *3 (W.D. Wash. July 9, 2014). The ALJ rejected the opinion as being based primarily on the plaintiff's subjective reports. *Id.* The district court, however, found that this was not a specific and legitimate reason supported by substantial evidence, pointing to the mental status exam and the psychologist's clinical observations of the plaintiff's behavior. The district court explained that "[l]ike the physical examination, the MSE is termed the *objective* portion of the patient evaluation." *Id.* (internal quotation omitted). Further, the "mental health professional is trained to observe patients for signs of their mental health not rendered obvious by the patient's subjective reports . . . ." *Id.*

Here, as in *Hayden*, Dr. Watt's opinion was based not only on the clinical interview, but on a mental status evaluation. (*See* AR 395.) Dr. Watt also had the opportunity to observe Plaintiff during their clinical interview, observing that Plaintiff "maintain[ed] a depressed mood and appeared very anxious throughout the interview." (*Id.*) Dr. Watt made observations about his mood and affect, his speech patterns, and his thought process, and was able to test Plaintiff's memory/concentration based on the ability to repeat number digits forwards and backwards and his abstract reasoning based on explaining how two words are similar. (AR 396.) The mental status exam and clinical observations are thus objective evidence that Dr. Watt used in formulating her opinion. Therefore, the ALJ's stated reason of Dr. Watt's opinion being based solely on subjective complaints is not a proper ground for rejecting her opinion.

Third, Plaintiff argues that the ALJ erred by rejecting Dr. Watt's opinion on the basis of her opinion being inconsistent with conservative mental health treatment and daily activities. (Plf.'s Mot. at 10.) Plaintiff contends that Dr. Watt had already assumed conservative mental health

8

treatment and similar activities of daily living, and therefore the ALJ erred in "rejecting physician testimony when the examining medical professional assumed the correct factual predicate." (*Id.*) Plaintiff relies on *Ogin v. Colvin*, in which the Ninth Circuit found that the ALJ did not provide a specific and legitimate reason for giving the psychologist's opinion little weight based on the plaintiff's failure to fully cooperate during the examination. 608 Fed. Appx. 519, 520 (9th Cir. 2015). The Ninth Circuit explained that while prior case law found that a "claimant's lackluster effort provided substantial evidence to support a finding that the *claimant* was not credible," this was not a legitimate reason to discount the medical opinion where the psychologist "expressly took into account [the claimant's] lack of cooperation in formulating his conclusions." *Id.*

The Court disagrees that *Ogin* is applicable here, with respect to Plaintiff's daily activities. In *Ogin*, the ALJ erred because he relied on the failure to cooperate, which the Ninth Circuit found went only to the plaintiff's credibility, not to discounting the medical opinion itself. 608 Fed. Appx. at 520. By contrast, the Ninth Circuit has found that an ALJ may discount the medical opinion where the prescribed restrictions were inconsistent with the level of activity maintained by the plaintiff. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("the restrictions appear to be inconsistent with the level of activity that [the plaintiff] engaged in by maintaining a household and raising two young children, with no significant assistance from her ex husband"); *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (explaining that a conflict regarding a plaintiff's daily activities "may justify rejecting a treating provider's opinion"); *Lee v. Berryhill*, No. 15-35630, -- Fed. Appx. --, 2017 WL 6629018, at *1 (9th Cir. Dec. 29, 2017) (finding that the ALJ provided specific and legitimate reasons to reject the examining physician's opinion where the plaintiff's "daily activities [were] inconsistent with [the physician's] conclusion that [the plaintiff] cannot work"); *Horsfall v. Berryhill*, 706 Fed. Appx. 386, 387-88 (9th Cir. 2017) ("the ALJ reasonably concluded that [the medical] opinion conflicted with [the plaintiff's] activities"). Thus, the ALJ could find that the daily activities were inconsistent with Dr. Watt's opinion.

Additionally, to the extent that Plaintiff asserts that Dr. Watt already assumed the same daily activities as the ALJ found, the Court disagrees. Dr. Watt found that Plaintiff did not usually go out or socialize due to anxiety, and needed help managing his money. (AR 396-97.) In

9

contrast, the ALJ found that Plaintiff went outside daily, went shopping in public stores for a few hours approximately twice a week, could pay bills and count change, spent time with others, and went to church on a regular basis without needing to be accompanied. (AR 21.) This is a distinctively higher level of social functioning than was assumed by Dr. Watt, and is a specific and legitimate reason to reject the examining physician's opinion. Thus, the Court concludes that the ALJ could discount Dr. Watt's opinion as being inconsistent with Plaintiff's daily activities.

Finally, Plaintiff contends that Dr. Watt's opinion is consistent with other opinions in the record, primarily Mr. Cacciaroni and Dr. Katzman.[1] (Plf.'s Mot. at 11.) Plaintiff, however, does *not* challenge the ALJ's finding that Mr. Cacciaroni's and Dr. Katzman's opinions were entitled to little weight. (*See* Plf.'s Reply at 5 (stating that Plaintiff was not raising Mr. Cacciaroni's opinion as a separate and distinct issue, but only with respect to how it supported Dr. Watt's findings, and not discussing Dr. Katzman's opinion at all).) Plaintiff cites no authority in support of concluding that the fact that a medical opinion is consistent with other evidence in the record that the ALJ gave little weight to entitles that medical opinion to greater weight. This is especially the case where the ALJ has, as discussed above, provided a specific and legitimate reason for discounting that medical opinion. Further, to the extent that there is conflicting evidence, "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1040 (9th Cir. 1995).

Therefore, the Court finds that the ALJ provided a specific and legitimate reason for giving Dr. Watt's opinion little weight, and thus did not err in finding that Plaintiff was not disabled.

---

[1] Plaintiff also appears to challenge the opinions of P. Ryan, MD and Randall J. Garland, Ph.D., to the extent "[t]he ALJ failed to resolve the foundational differences between Dr. Ryan and Dr. Garland which rendered the criticism of Dr. Watt by Dr. Garland (and not cited by the ALJ) insubstantial." (Plf.'s Mot. at 12; *see* AR 92, 108.) The "foundational difference" appears to be consideration of a therapist note. (Plf.'s Mot. at 12.) As Plaintiff points out, however, the ALJ did not rely on the criticism of Dr. Watt by Dr. Garland in rejecting Dr. Watt's opinion, so it is unclear how this failure to resolve the foundational differences is relevant to the ALJ's consideration of Dr. Watt's opinion. Furthermore, both Dr. Ryan and Dr. Garland came to the *same* conclusion as to Dr. Watt's opinion, as both concluded that Dr. Watt's opinion overestimated the severity of Plaintiff's restrictions and limitations because it relied heavily on subjective reporting of symptoms and was not supported by the totality of evidence. (AR 93, 109.) Further, as stated above, the ALJ gave a specific and legitimate reason for giving Dr. Watt's opinion little weight that is not reliant on the opinions of Dr. Ryan and Dr. Garland, such that any asserted error was harmless.

# V. CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

IT IS SO ORDERED.

Dated: March 20, 2019

_____
KANDIS A. WESTMORE
United States Magistrate Judge